UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BYRON A. JONES, III,

    Petitioner,

v.                                                     Case No. 8:23-cv-291-WFJ-AAS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

    Respondent.
_____/

**ORDER**

Byron A. Jones, III, a Florida prisoner, initiated this action by filing a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 10). Mr. Jones filed a reply. (Doc. 14). After careful review, the petition is **DENIED**.

**I.    Background**

    **A.    Factual Background; State-Court Procedural History**

This case arises from a home-invasion robbery that took place in the early morning hours of December 14, 2014. (Doc. 11-4, Ex. 1b, at 227). The victims were Jonathan Jeffery and his wife Brandi Jeffery. (*Id.* at 221). They lived with their 17-month-old child in an apartment complex in Sarasota, Florida. (*Id.*) Mr. Jeffery was a drug dealer. (*Id.* at 234). Christian Theodore—a member of the Bloods gang—learned that Mr. Jeffery kept $8,000 and an Xbox at his apartment. (*Id.* at 464, 470). Around Thanksgiving 2014, Mr. Theodore and Mr. Jones—the "leader" of the St. Petersburg division of the Bloods—discussed over

1

the phone their plans to rob Mr. Jeffery. (*Id.* at 477, 523, 591). Soon after, Mr. Jones called another Bloods member (Vincent Gonzalez) and proposed a "211, which [meant] a breaking and entering." (*Id.* at 606). Mr. Gonzalez "said no," but he eventually agreed to participate after learning "how much money" was at the apartment. (*Id.* at 606, 609).

The evening before the robbery, Mr. Jones, Mr. Theodore, Mr. Gonzalez, and two other Bloods (Aenri Ellis and Shakoy Gale) met at the house of Azalea Mendoza, Mr. Theodore's girlfriend. (*Id.* at 460, 487). Mr. Jones assigned roles for the robbery. (*Id.* at 623-24). For example, Mr. Theodore and Mr. Gonzalez would hold Mr. Jeffery at gunpoint while Mr. Gale searched for "the money." (*Id.* at 624-25). After these discussions, Mr. Jones and Mr. Theodore drove to a nearby Walmart. (*Id.* at 630-31). Surveillance footage captured them buying zip ties, bandannas, and gloves. (*Id.* at 411-13, 418-19, 436). These items were used during the robbery. (*Id.* at 419-20, 633-34).

Although Mr. Jones was supposed to be the "third gunman," he was "too drunk" to participate in the home invasion. (*Id.* at 530, 630). He and Ms. Azalea drove to Mr. Jeffery's apartment complex and waited outside. (*Id.* at 493). Mr. Theodore, Mr. Gonzalez, Mr. Ellis, and Mr. Gale arrived in a separate car. (*Id.* at 496). The four men broke into Mr. Jeffery's apartment, ordered him and his to wife to lie prone on their bed, and tied their hands behind their backs with zip ties. (*Id.* at 229-30). One of the men said, "Where the F is it at?" (*Id.* at 233). Mr. Jeffery eventually responded, "It's in the closet in the green backpack." (*Id.*) After taking the backpack, three cell phones, and an Xbox, three of the men began to leave the apartment. (*Id.* at 237, 240, 646-48). The fourth man—Mr. Theodore—stayed behind in the bedroom. (*Id.* at 648). Believing that Mr. Jeffery had recognized him, Mr. Theodore

2

shot him once in the back of the head. (*Id.* at 649-50). Mr. Jeffery died soon after. (*Id.* at 746-48).

On the drive back to Ms. Azalea's house, Mr. Jones looked through the backpack and removed "a wad of money." (*Id.* at 502). At the house, Mr. Theodore told Mr. Jones that "sh*t went sideways" and "they offed that n***a." (*Id.* at 507). Later, Mr. Jones and the other men divided up the money from the robbery. (*Id.* at 510-11). Each received $1,000. (*Id.* at 654).

Mr. Jones was arrested along with the other participants in the robbery. He was charged with first-degree felony murder and armed home-invasion robbery. (Doc. 11-2, Ex. 1, at 96-97, 157-58). Mr. Gonzalez and Ms. Mendoza agreed to cooperate with the prosecution. (Doc. 11-4, Ex. 1b, at 463, 603). In exchange for his testimony, Mr. Gonzalez pled guilty to second-degree murder and received a sentence of twenty-eight years' imprisonment. (*Id.* at 603-04). Ms. Mendoza pled guilty to "[a]ccessory after the fact to second-degree murder" and received a sentence of ten years' imprisonment. (*Id.* at 463). Both faced the possibility of a mandatory life sentence for first-degree felony murder. (*Id.* at 542, 600).

Mr. Jones was also charged with witness tampering. (Doc. 11-2, Ex. 1, at 158). The charge stemmed from an incident that took place at the Sarasota courthouse in December 2015, approximately one year after the robbery. (Doc. 11-4, Ex. 1b, at 658). Mr. Jones and Mr. Gonzalez were in a waiting area. (*Id.* at 659-60). Mr. Jones pointed to Mr. Gonzalez while talking to a third inmate. (*Id.* at 660). The inmate said to Mr. Jones, "Who, him? Oh, okay, I got you. Next time I see him, I got you." (*Id.*) Shortly thereafter, Mr. Jones and Mr.

Gonzalez were taken to adjacent holding cells. (*Id.* at 661). Mr. Jones told Mr. Gonzalez, "Yo, man, you can't get on the stand, bro. You know, if you get on the stand, they're going to kill you; right? . . . . [Y]ou know, they're trying to put the needle in me, man. If you get up on the stand, it's really going to hurt me." (*Id.* at 664).

Mr. Jones was tried together with Mr. Ellis, one of the four men who entered the apartment. (*Id.* at 1). Both were found guilty as charged, and both received total sentences of life imprisonment. (*Id.* at 900-02, 912, 914). Following an unsuccessful direct appeal, Mr. Jones moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 11-5, Exs. 4, 6). The postconviction court denied relief, and the appellate court affirmed in an unexplained decision. (*Id.*, Ex. 6, at 42-48, 122-24; *id.*, Ex. 9).

B.   **Federal-Court Procedural History**

After exhausting his state-court remedies, Mr. Jones filed a federal habeas petition. (Doc. 1). He raised four claims: (1) trial counsel was ineffective for waiving any objection to the joint trial of Mr. Jones and Mr. Ellis; (2) trial counsel was ineffective for failing to object to the introduction of evidence about Mr. Jones's "gang affiliation"; (3) the prosecution violated *Brady*[1] and *Giglio*[2] by failing to disclose the "true benefit" Mr. Gonzalez and Ms. Mendoza received for testifying at trial; and (4) trial counsel was ineffective for failing "to discover the true benefit the cooperating witnesses would receive

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *Giglio v. United States*, 405 U.S. 150 (1972).

4

for their testimony and failing to cross examine the witnesses based on that information." (Doc. 1).

After the petition was fully briefed, the Court granted Mr. Jones ninety days to "conduct discovery with the limited purpose of supplementing the factual record surrounding" his *Brady/Giglio* claim. (Doc. 15 at 2). Through counsel, Mr. Jones "completed the discovery within the scope the Court authorized." (Doc. 29 at 2). Mr. Jones subsequently indicated that his "discovery efforts ha[d] not uncovered evidence in support of [his] *Giglio* claim that would allow [him] to meet his burden of supporting the claim at an evidentiary hearing." (*Id.*) Accordingly, he "withdr[ew] the portion of . . . his . . . [p]etition that assert[ed] that the State violated its *Brady/Giglio* obligations." (*Id.*) Based on Mr. Jones's stipulation, the *Brady/Giglio* claim is dismissed. This case proceeds on the remaining claims in the petition.

## II.     Standards of Review

### A.     AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The appellate court in Mr. Jones's case affirmed the denial of postconviction relief without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues

a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

    **B.**    **Ineffective Assistance of Counsel**

Mr. Jones alleges ineffective assistance of counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Jones must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Jones must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly

7

deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III. Discussion[3]

### A. Ground One—Failure to Object to Joint Trial

As noted above, Mr. Jones was tried jointly with Mr. Ellis, one of the four men who entered the victims' apartment. (Doc. 11-4, Ex. 1b, at 1). During a pretrial hearing, counsel for Mr. Jones indicated that she had "no objection" to the joint trial. (Doc. 11-5, Ex. 6, at 197-98). Mr. Jones now contends that counsel "performed deficiently by waiving [this] objection." (Doc. 1 at 19). According to Mr. Jones, he suffered "prejudice" from being tried together with Mr. Ellis. (*Id.* at 21). First, a "significant quantity" of the evidence against Mr. Ellis was allegedly "irrelevant to [Mr. Jones's] guilt or innocence and would

---

[3] Respondent argues that certain claims are unexhausted, but "a court may skip over the exhaustion issue" where, as here, "it is easier to deny . . . the petition on the merits without reaching the exhaustion question." *Santiago-Lugo v. Warden*, 785 F.3d 467, 475 (11th Cir. 2015).

8

not have been introduced in a separate trial." (*Id.* at 22). For example, the jury heard about Mr. Ellis's "desire to enter the house first because 'he was the biggest and he had the bulletproof vest.'" (*Id.*) Second, the joint trial "united [Mr. Jones and Mr. Ellis] in the mind of the jury and created spillover prejudice." (*Id.* at 23). Third, the jury heard not only that Mr. Jones engaged in witness tampering with respect to Mr. Gonzalez, but also that Mr. Ellis tampered with Mr. Gonzalez in a "separate incident[]." (*Id.* at 21).

The postconviction court rejected this claim, finding that Mr. Jones "failed to sufficiently allege prejudice resulting from trial counsel's waiver of objection to the joinder." (Doc. 11-5, Ex. 6, at 123). The court explained that, although Mr. Jones "insist[ed] the State's case against him relied almost entirely on the testimony of Azalea Mendoza and Vincent Gonzalez," he failed to "allege that, or explain how, severance of the cases would have resulted in exclusion of their testimony against" him. (*Id.*) Moreover, Mr. Jones cited "some of the evidence at trial [that] was particular to the case against [Mr.] Ellis and had nothing to do with [Mr. Jones's] case," but he failed to "allege or explain how this evidence was *prejudicial* to [Mr. Jones's] case and how its exclusion might have reasonably resulted in a different outcome." (*Id.*) Nor did Mr. Jones "identify any particular evidence that improperly bolstered the case against him or created 'spillover prejudice.'" (*Id.*) In short, the postconviction court found that Mr. Jones failed to "identify evidence (1) that would have been inadmissible if [he] had been tried separately, and (2) without which there [was] a reasonable probability that the outcome of the trial would have been different." (*Id.*)

This ruling was reasonable. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Jones]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. Jones cannot meet this demanding standard. A fairminded jurist could conclude that, even if Mr. Jones had been tried separately, there is no "reasonable probability that . . . the outcome . . . would have been different." *Reed*, 767 F.3d at 1261. At a severed trial, the jury would have heard the most important evidence against Mr. Jones—namely that (1) Mr. Jones and Mr. Theodore discussed over the phone their plans to rob Mr. Jeffery, (2) Mr. Jones persuaded Mr. Gonzalez to participate in a "breaking and entering," (3) Mr. Jones assigned each participant a role in the robbery, (4) Mr. Jones was supposed to be the "third gunman" but was "too drunk" to participate, and (5) Mr. Jones and Mr. Theodore purchased zip ties, bandannas, and gloves that were later used during the home invasion. (Doc. 11-4, Ex. 1b, at 411-13, 418-20, 436, 477, 523, 530, 606, 609, 630, 633-34). This evidence was independently sufficient to convict Mr. Jones as a principal to the murder

10

and the home-invasion robbery. *See Mathis v. State*, 51 So. 3d 1250, 1251 (Fla. 2d DCA 2011) ("[I]n order to be a principal in a crime, one must have a conscious intent that the crime be done and must do some act or say some word which was intended to and does incite, cause, encourage, assist, or advise another person to actually commit the crime."); *Brinson v. State*, 18 So. 3d 1075, 1077 (Fla. 2d DCA 2009) ("[T]he felony murder rule and the law of principals combine to make a felon liable for the acts of his co-felons.").

To be sure, some of the evidence at trial was specific to Mr. Ellis. The jury learned, for example, that Mr. Ellis "wanted to be the first one in" because he "was the biggest and he had [a] bulletproof vest." (Doc. 11-4, Ex. 1b, at 625). Likewise, the jury heard that Mr. Ellis attempted to intimidate Mr. Gonzalez in the courthouse by making a gesture in the form of a handgun, pointing the "simulated" gun at him, and saying, "[B]ah." (*Id.* at 666-67). But as the postconviction court explained, Mr. Jones failed to show that "this evidence was prejudicial to [his] case [or that] its exclusion might have reasonably resulted in a different outcome." (Doc. 11-5, Ex. 6, at 123 (emphasis omitted)). Indeed, "compelling prejudice does not exist merely because much of the evidence at trial applies only to a co-defendant." *United States v. Francis*, 131 F.3d 1452, 1459 (11th Cir. 1997).

Finally, the jury was instructed that (1) "[s]eparate crimes [were] charged against each defendant in each count of the charging document," (2) the defendants were "tried together," but "the charges against each defendant and the evidence applicable to him must be considered separately," and (3) a "finding of guilty or not guilty as to one of the defendants must not affect your verdict as to the other defendant[]." (Doc. 11-4, Ex. 1b, at 810). "[A] court's cautionary instructions ordinarily will mitigate the potential 'spillover

11

effect' of evidence of a co-defendant's guilt." *United States v. Kennard*, 472 F.3d 851, 859 (11th Cir. 2006). Nothing in the record suggests that the jury could not follow the instruction to consider "the evidence applicable" to each defendant "separately." (Doc. 11-4, Ex. 1b, at 810).

### B. Ground Two—Failure to Object to Evidence of Gang Affiliation

Mr. Jones contends that trial counsel was ineffective for "failing to move *in limine* to exclude or object to the admission of testimony regarding [his] gang affiliation." (Doc. 1 at 23). As noted above, the jury learned that Mr. Jones and the four men who broke into the victims' residence were members of the Bloods gang. (Doc. 11-4, Ex. 1b, at 470). According to Mr. Jones, evidence of his "purported gang membership was not relevant to any issue in the case," and it "unfairly prejudiced the jury against him." (Doc. 1 at 27). Mr. Jones maintains that "any reasonably prudent attorney would have recognized the harmfulness of this testimony and objected to its admission." (*Id.*)

The postconviction court rejected this claim. (Doc. 11-5, Ex. 6, at 45). It held that, because "the gang evidence was relevant to a material and disputed issue," no "reasonable probability" existed that "a motion *in limine* or objection would have resulted in exclusion of this evidence or otherwise changed the outcome of the trial." (*Id.*) The court explained that the "gang-related evidence in this case did not pertain to the evils of gangs generally." (*Id.*) Rather, "the evidence was relevant to the material and disputed issue of whether [Mr. Jones] was aware of, and aided in planning, the robbery committed by the others." (*Id.*) As the court noted, the "defense theory at trial was that [Mr. Jones] was unaware of the robbery plans and did not facilitate them." (*Id.*) In the court's view, the "gang-related evidence was

12

necessary to rebut that theory by showing these individuals shared a common gang membership, [that Mr. Jones] was their leader, and that they had a history of meeting and planning crimes similar to the meetings that preceded the robbery in this case." (*Id.*) Therefore, the gang-related evidence was "relevant" and admissible. (*Id.*)

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The postconviction court held that, as a matter of Florida law, any objection to the gang-related evidence would have failed because the testimony was "relevant to a material and disputed issue." (Doc. 11-5, Ex. 6, at 45). Thus, the postconviction court "already has told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Mr. Jones] argues [she] should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). That determination is binding on federal habeas review. *See Hagins v. Sec'y*, No. 8:19-cv-3145-TPB-AAS, 2022 WL 17067376, at *4 (M.D. Fla. Nov. 17, 2022) (holding that, in evaluating an ineffective-assistance claim, a federal court "must defer to the state court's finding that the evidence was relevant and admissible under Florida law"); *Washington v. Sec'y, Dep't of Corr.*, No. 8:19-cv-542-KKM-TGW, 2022 WL 861586, at *13 n.8 (M.D. Fla. Mar. 23, 2022) ("To the extent the resolution of [petitioner's] ineffective-assistance claim implicitly relies on an application of Florida evidentiary law governing whether

evidence is relevant and admissible, this Court must defer to the state court's determination that a motion to suppress the evidence would have been without merit.").

Because the postconviction court "authoritatively decided as a matter of [Florida] law" that the gang-related evidence was admissible, the remainder of the analysis is straightforward. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024). "[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance." *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994). Thus, the postconviction court reasonably concluded that counsel was not deficient for failing to object to the gang-related evidence.

### C. Ground Three—Failure to Discover the "True Benefit" Mr. Gonzalez and Ms. Mendoza Received for Testifying at Trial

As noted above, Mr. Gonzalez and Ms. Mendoza agreed to cooperate with the prosecution and testify at trial. (Doc. 11-4, Ex. 1b, at 463, 603). The jury learned that, in exchange for his testimony, Mr. Gonzalez received a sentence of twenty-eight years' imprisonment for second-degree murder. (*Id.* at 603-04). Ms. Mendoza, for her part, received a sentence of ten years' imprisonment for "[a]ccessory after the fact to second-degree murder." (*Id.* at 463). Both faced the possibility of a mandatory life sentence for first-degree felony murder. (*Id.* at 542, 600).

Mr. Jones contends that Mr. Gonzalez and Ms. Mendoza received additional benefits for their testimony, and that trial counsel was deficient for failing to uncover this fact. (Doc. 1 at 28-29). Approximately eighteen months after trial, the prosecution moved to reduce Mr. Gonzalez's sentence by ten years. (Doc. 11-5, Ex. 6, at 200). The prosecution

14

explained that, under his plea agreement, Mr. Gonzalez was required to "testify truthfully and consistently about his actions and those of his co-defendants before, during, and after the home-invasion robbery." (*Id.*) Mr. Gonzalez provided such testimony, which was "instrumental in the State's successful convictions" of "[a]ll four defendants." (*Id.*) But Mr. Gonzalez also testified—at "continuing risk to himself"—"about his own gang affiliation and that of his co-defendants, as well as the inner workings of gang hierarchy and the day-to-day business." (*Id.* at 201). This "gang-related trial testimony was above and beyond what had been contemplated by either the State or Mr. Gonzalez in his original plea agreement." (*Id.*) Thus, the prosecution sought—and the trial court granted—a ten-year reduction in Mr. Gonzalez's sentence. (*Id.* at 201-02).

Approximately one year after trial, the Florida Department of Corrections ("FDOC") informed the trial court that Ms. Mendoza qualified as a "youthful offender" and was "eligible to participate in the Basic Training Program," otherwise known as "boot camp." (*Id.* at 205). "When a defendant who [qualifies] as a youthful offender successfully completes boot camp, the trial court is constrained to reduce the defendant's remaining term of incarceration to a period of probation." *Thomas v. State*, 825 So. 2d 1032, 1033 (Fla. 1st DCA 2002). The trial court approved the request for Ms. Mendoza to participate in the program, and three months later, the FDOC informed the court that she was "expected to successfully complete the program" the next month. (Doc. 11-5, Ex. 6, at 206, 212). The court subsequently ordered Ms. Mendoza released on probation. (*Id.* at 206). As a result, instead of "serving ten years in prison and being released, with gain time, in 2023,

[Ms.] Mendoza was released from prison almost six years earlier than that, in 2017." (Doc. 1 at 33).

Mr. Jones argues that trial counsel "performed deficiently by failing to discover the true benefit the cooperating witnesses would receive for their testimony and failing to cross examine the witnesses based on that information." (*Id.* at 29). As explained above, Mr. Jones conducted discovery on his related *Brady/Giglio* claim, which rested on the prosecution's alleged failure to disclose the additional benefits Mr. Gonzalez and Ms. Mendoza received for their testimony. (Doc. 15 at 2). Mr. Jones ultimately "withdr[ew]" his *Brady/Giglio* claim because his "discovery efforts ha[d] not uncovered evidence in support of [the] claim that would allow [him] to meet his burden of supporting [it] at an evidentiary hearing." (Doc. 29 at 2). Although Mr. Jones did not withdraw his ineffective-assistance claim, it fails even under *de novo* review.

"[T]rial counsel has not performed deficiently when a reasonable lawyer could have decided, under the circumstances, not to investigate or present particular evidence." *Payne v. Allen*, 539 F.3d 1297, 1316 (11th Cir. 2008). Mr. Jones offers no evidence that at the time of trial, the prosecution had agreed to (1) seek a further sentence reduction for Mr. Gonzalez or (2) advocate for Ms. Mendoza's enrollment in the "Basic Training Program." As the postconviction court explained, these "additional benefits . . . were prospective and uncertain at the time of [Mr. Jones's] trial." (Doc. 11-5, Ex. 6, at 47-48). Without any evidence of an understanding between the prosecution and its witnesses about these future benefits, the Court cannot say that counsel was deficient for failing to pursue the matter. *See Hodge v. Haeberlin*, 579 F.3d 627, 651 (6th Cir. 2009) ("Mere speculation that

16

additional investigation would have uncovered wrongfully withheld exculpatory evidence does not establish either that counsel acted unreasonably or that [petitioner] was prejudiced."). Thus, Mr. Jones fails to overcome "the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment."[4] *Payne*, 539 F.3d at 1315.

For the same reason—*i.e.*, the absence of any evidence that the prosecution agreed to provide future benefits to the cooperating witnesses—Mr. Jones cannot show that he was prejudiced by counsel's failure to investigate. *See Reed*, 767 F.3d at 1261 ("The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different."); *Thomas v. Clarke*, No. 2:19-cv-479, 2020 WL 4690353, at *21 (E.D. Va. June 30, 2020) (petitioner "could not have been prejudiced" by counsel's failure to present evidence of "promises of immunity" to witnesses because "there was no available evidence of a promise of leniency"), *adopted by* 2020 WL 4680136 (E.D. Va. Aug. 12, 2020).

## IV. Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. Jones's petition (Doc. 1) is **DENIED**.

---

[4] Moreover, counsel could not predict that the FDOC would find that Ms. Mendoza was eligible for the "Basic Training Program." That determination turned on several "criteria," including "the offender's criminal history and the possible rehabilitative benefits of 'shock' incarceration." Fla. Stat. § 958.045(2).

2. Respondent's request (Doc. 10 at 2) to dismiss the Attorney General of Florida from this action is **GRANTED**.[5]

3. The **CLERK** is directed to enter judgment against Mr. Jones and to **CLOSE** this case.

4. Mr. Jones is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Jones must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Jones has not made the requisite showing. Because Mr. Jones is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on June 18, 2025.

_____
WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

---

[5] When prisoners challenge their physical confinement, "the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004).